# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

DODDIE DENISE BOSS,         )
)
        Plaintiff,        )
)
      vs.           )    Case No. 2:08-cv-04195-NKL
)
MORGAN COUNTY, MISSOURI, et al.  )
)
      Defendants.     )
)

## O R D E R

Plaintiff Doddie Denise Boss ("Boss") brings this action under 42 U.S.C. §§ 1981,

1983, and 1985 against Defendants Morgan County, Missouri; Sheriff James Petty, in his

individual and official capacities as Morgan County Sheriff; Tim Harlan, in his individual

and official capacities as Morgan County Jail Administrator; Mike Nienhuis, in his individual

and official capacities as Morgan County Deputy Sheriff; and John Doe(s) in their individual

and official capacities as Morgan County Deputy Sheriffs (collectively "Defendants").  In

her complaint [Doc. # 1], Boss alleges: (1) failure to provide vital medical treatment in

violation of the Fourth, Fifth, and Fourteenth Amendments, against all Defendants; (2)

depravation of life's necessities and disparate treatment in violation of the Fourth, Eighth,

and Fourteenth Amendments, against all Defendants; and (3) failure to properly train and

supervise employees, against Morgan County and Defendant Petty.  Pending before this

Court are Defendants' Motion for Summary Judgment [Doc. # 27] and Plaintiff's Motion to

1

Strike [Doc. # 50]. For the reasons stated herein, Defendants' Motion is GRANTED in part and DENIED in part. Plaintiff's Motion is GRANTED in part and DENIED in part.

## I.    Factual Background[1]

On August 27, 2005, Boss was arrested in Morgan County, Missouri, on an outstanding warrant for possession of a controlled substance. She was booked into the Morgan County jail that day, and at her booking interview she disclosed that she suffered from various medical conditions, including bipolar disorder and manic depression. The medical questionnaire filled out by a Morgan County jailer indicated that Boss was taking medication for her psychiatric disorders, among other conditions.

Sometime after her booking, Boss was notified that Morgan County did not house female prisoners in its jail and that she would be transported to the Miller County jail. Until her transport to Miller County, Boss was housed in Morgan County's detox cell. The detox cell was a small room with no furniture, no mattress, two large windows on either side of the room, a slightly elevated concrete pad on the floor, and a hole in the floor to be used for urination. From the detox cell, Boss could be seen by jailers, police officers, and other

---

[1]The Court has considered the parties' statements of undisputed fact which are supported by evidence. The Court deems admitted both parties' fact statements which have not been directly controverted. *See* Local Rule 56.1 ("Each fact in dispute shall be set forth in a separate paragraph, . . . and, if applicable, shall state the paragraph number in the movant's listing of facts that is disputed. All facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party."). In considering each parties' motion, the Court has drawn all inferences in favor of the non-movant. The Court's findings pursuant to Rule 56.1, deeming certain facts admitted, are reflected in the facts set forth below.

2

inmates when they were brought in for booking as a door was right by the cell's window. While Boss was in the detox cell, she was allowed to use the toilet in another inmate's holding cell for bowel movements. This inmate was removed from the holding cell when Boss used this toilet. The toilet in this holding cell was located right across from a large window in plain view so Boss could be seen using this toilet by jailers, police officers, and other inmates. Boss was held in the detox cell from the time of her booking at 3:28 p.m. on August 27, until she was transported to Miller County, where she was booked at 9:21 p.m. that same day.

After being transported to Miller County, Boss spoke to a nurse about her medications. While at Miller County, Boss experienced what she believed was a heart attack, and she informed the Miller County jailers of her condition. Miller County officials then contacted Morgan County, advising Morgan County jailers that they were unable to continue holding Boss because of her medical condition. On August 28, a Morgan County Deputy Sheriff was dispatched to collect Boss, and she was transported back to Morgan County. During her trip back to Morgan County, Boss experienced another attack and the deputy used his radio to ask if he could get out and help her or call an ambulance. He was told to bring Boss to the jail where a nurse would attend to her.

Upon her arrival back at the Morgan County jail, Defendant Neinhuis ordered Boss placed back into the detox cell for holding and observation. Within approximately two-and-a-half hours, Boss was evaluated by a nurse who discussed with Boss her symptoms and

medications. The nurse informed Boss that certain medications were not currently available, but that the nurse would call and try to get them for Boss. The nurse was unable to obtain current prescriptions. On August 29, Boss asked to see the nurse and to have her medications, and the nurse informed her no prescription medications were available but gave her Tums to help with diarrhea and indigestion.

With regard to her cell conditions upon her return to the Morgan County jail, Boss spent the night of August 28 in the detox cell. On August 29, Boss was transferred to a holding cell, where she remained for the rest of her incarceration at the Morgan County jail. The holding cell had a large window on the wall and a small cell-door window. The holding cell contained a mattress placed directly on the floor, a blanket, a toilet, and a sink. While in the holding cell, Boss could be viewed doing everything in her cell, including using the toilet, through the large window by law enforcement personnel, jailers, cafeteria workers, and inmates.

During her first night in the holding cell, Boss attempted to cover the large window with toilet paper held in place by toothpaste but this was torn down by the jailers. At some point, a magnet was placed over the small cell-door window because Boss was talking to her son, who was also housed at the Morgan County jail at the same time as Boss.

Boss asserts that she knew she could be seen using the toilet inside her holding cell because her son told her that he saw her and because Boss could see inmates looking at her and heard comments, such as "Woo hoo." When Boss complained to one of the jailers about

4

the toilet situation, she was told that the jail does not house females and to just "deal with it." At one point, Boss started wrapping a blanket around her to cover herself up while on the toilet. Boss was released from the Morgan County jail on August 31, 2005, and the charges against her were subsequently dropped.

## II.    Discussion

### A.    Plaintiff's Motion to Strike

Boss has moved this Court to strike Defendant Petty's affidavit, along with any portions of Defendants' briefs which rely on the affidavit [Doc. # 50]. Both parties agree that portions of the affidavit are not based on personal knowledge and that it conflicts with Defendant Petty's deposition testimony. After reviewing the parties' submissions, the Court finds that paragraphs 3 and 5-9 are not supported by personal knowledge. As a result, this Court does not consider these paragraphs of the affidavit in its opinion.

### B.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to

5

respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248.

### C. Qualified Immunity

Qualified immunity "protects government officials 'from liability [in their individual capacities] for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. ---, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The immunity has been applied broadly, and it protects "all but the plainly incompetent or those who knowingly violate the law." *See Malley v. Briggs*, 475 U.S. 335, 341 (1986). Because qualified immunity is an immunity from suit, as opposed to a mere defense to liability, it is effectively lost if a case is allowed to go to trial, and the Supreme Court has repeatedly stressed that district courts should resolve qualified immunity issues at the earliest possible stage. *See, e.g.*, *Pearson*, 129 S. Ct. at 815; *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007); *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

A qualified immunity analysis involves two questions: (1) was a constitutional right

6

violated; and (2) was the right clearly established such that a reasonable officer should have known his or her actions violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Recently, the Supreme Court granted district courts the freedom to address these two questions in whichever order is more appropriate under the facts and circumstances of each case. *See Pearson*, 129 S. Ct. at 821.

### 1.    Medical Treatment

When the state holds a person against his or her will, it accepts a constitutional duty to provide for that person's safety and well-being. *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998). A jailer who is deliberately indifferent to an inmate's medical needs is subject to suit under section 1983. *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009).

To establish deliberate indifference, Boss must prove that she had objectively serious medical needs and that the jailers actually knew of those needs but deliberately disregarded them. *Id.* In the context of determining whether a jailer is entitled to qualified immunity in a suit alleging deliberate indifference to serious medical needs, a jailer "may rely on a medical professional's opinion if such reliance is reasonable." *Id.* at 981; *see also Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) ("The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment."); *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical

7

professionals." (citation omitted)). In *McRaven*, the Eighth Circuit held that a prison official's reliance on a nurse's recommendation was not reasonable because the prison official knew about certain drugs consumed by the inmate, and the nurse's medical assessment was based on incorrect information because the nurse believed that the inmate's intoxication was from alcohol and not drugs. 577 F.3d at 981.

Here, unlike *McRaven*, the jailers in this case reasonably relied on the nurse's medical opinion. Notably, Boss has not asserted a claim against the nurse in this case. Upon her return to the Morgan County jail, Defendant Neinhuis ordered Boss placed back into the detox cell for holding and observation. Within approximately two-and-a-half hours, Boss was evaluated by a nurse who discussed with Boss her symptoms and medications. The nurse informed Boss that certain medications were not currently available, but she would call and try to get them for Boss. The nurse was unable to obtain current prescriptions and, therefore, lacked the authority to dispense the drugs requested. She did give Boss Tums to help with diarrhea and indigestion. On these facts, the law does not clearly require jailers with less medical training to second-guess the nurse's decision in this case. *See Meloy*, 302 F.3d at 849. Because the evidence established that Boss never suffered a heart attack, but instead had a panic attack, the jailers reasonably relied on the nurse's opinion that Boss only needed Tums for her indigestion. At a minimum, there was no clearly established law to the contrary. Therefore, the jailers sued in their individual capacities are entitled to qualified immunity on Count I as a matter of law.

8

## 2.    Privacy and Disparate Treatment Count

Boss's arguments on her claim for privacy and disparate treatment fall into two categories: (1) that her Eighth Amendment rights were violated by being forced to sleep on a floor mattress in the holding cell and directly on the floor in the detox cell; (2) that her Fourth, Eighth and Fourteenth Amendment rights to privacy were violated by being held in detox and holding cells where she could be viewed using the toilet by jail staff and inmates of the opposite sex.

With regard to the first category, the Eighth Circuit has already determined there was no Eighth Amendment violation under circumstances more severe than those experienced by Boss. The Eighth Circuit has held that floor sleeping and other such confinement conditions are not actionable. *O'Leary v. Iowa State Men's Reformatory*, 79 F.3d 82, 83-84 (8th Cir. 1996) (finding that several days without underwear, blankets, mattress, exercise or visitation did not violate the Eighth Amendment); *Williams v. Delo*, 49 F.3d 442, 446 (8th Cir. 1995) (finding no violation where prisoner was placed in segregation without clothes, running water, hygiene supplies, mattress, and legal mail for a period of four days). Thus, there is no clearly established right that would justify stripping the individual defendants of qualified immunity with regard to Boss's sleeping conditions.

However, with regard to Boss's privacy claim, the Court finds that she has made a submissible case. Under Eighth Circuit law, "while inmates may lose many freedoms at the prison gate, they retain at least some of their constitutional rights while confined." *Timm v.*

9

*Gunter*, 917 F.2d 1093, 1099 (8th Cir. 1990) (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987)). The Eighth Circuit has further recognized that inmates have a right to bodily privacy, which must be weighed against institutional concerns of safety and equal employment opportunities. *Id.* at 1101 ("Whatever minimal intrusions on an inmate's privacy may result from [opposite sex surveillance of male inmates by female guards], whether an inmate is using the bathroom, showering, or sleeping in the nude, are outweighed by institutional concerns for safety and equal employment opportunities."); *see also Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing "a prisoner's constitutional right to bodily privacy because most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating'" (quoting *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981))); *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992) (explaining that "we have little doubt that society is prepared to recognize as reasonable the retention of a limited right of bodily privacy even in the prison context").

In prisoner rights cases, the Eighth Circuit conducts a balancing test of the *Turner v. Safley* factors to determine whether the privacy interest is outweighed by penal interests. *See Timm*, 917 F. 2d at 1099 n.8 ("Although *Turner* is a first amendment case, we believe its analysis equally applies to other inmates' rights cases."). Thus, under *Turner*, there are four factors that are relevant in deciding whether the policy and conduct in this case is reasonable:

> First, there must be a sufficient connection between the regulation and the
> governmental interest used to justify the regulation. Second the availability of

10

alternative means of exercising the right at issue must be considered. Third, consideration is required of the impact that accommodating the asserted right would have on guards, other inmates, and prison resources. Fourth, the availability of ready alterative to the regulation should be considered.

*Timm*, 917 F.2d at 1099; *see also Goff v. Harper*, 235 F.3d 410, 414-15 (8th Cir. 2000) ("Not all four factors will be relevant to each case . . . . For example, the second *Turner* factor–availability of other avenues of exercising the right infringed upon–is much more meaningful in the first amendment context than the fourth or eighth, where the right is to be free from a particular wrong." (quoting *Michenfelder v. Sumner*, 860 F.2d 328, 331 n.1 (9th Cir. 1988))).

In this case, Morgan County maintains a jail that does not have a separate facility for women, yet Boss was confined in the Morgan County jail. Under the *Turner* factors, Boss's privacy interest in not having her genitals exposed must be balanced against the Morgan County jail's interest in safety of its inmates. As for her exposure to her jailers, her privacy interests are outweighed by institutional concerns for safety and equal employment opportunities. *See, e.g.*, *Timm*, 917 F.2d at 1100-02. However, this case is not the typical "guard viewing inmates" case. Rather, this case involves exposure of an inmate using the toilet to law enforcement personnel, jailers, cafeteria workers, and inmates of the opposite sex. Upon her arrival at the Morgan County jail, Boss was placed in the detox cell, which had windows that exposed her to more than just jailers. This cell had a hole in the floor, which Boss used for urination. Although Boss was moved to another inmate's cell when she needed to have a bowel movement, this cell also had windows and the toilet was open to the

11

rest of the jail population.

When Boss returned from the Miller County jail, she was again placed in the same detox cell and later moved to a holding cell. Only when she was in the holding cell, did Boss have access to a blanket, which she eventually used to cover herself up when she used the toilet, which was also open to the rest of the jail population. *Cf. Timm*, 917 F.2d at 1102 ("The urinal is protected by a three-sided wall which, as the District Court found, permits an inmate the opportunity to minimize the view of his genital area from the guard tower.").

Defendants claim they needed to observe Boss once she returned from the Miller County jail because of the medical condition that resulted in her return. Observation of Boss by the jailers may have been important for her medical needs. However, Defendants fail to demonstrate why observation of Boss by other inmates and others coming into the jail was necessary. *Cf. Hill v. McKinley*, 311 F.3d 899, 902-03 (8th Cir. 2002) (holding that there was no constitutional violation where detainee was required to walk through the jail nude in the presence of male guards where guards "closed windows and food slots on nearby cells" and were the only ones to observe the detainee naked). Further, Defendants fail to demonstrate why it was necessary to observe Boss through multiple large windows in her various cells or why those windows could not be partially covered to at least obstruct other inmates' view of her using the toilet.

Defendants present no evidence regarding whether Boss could have been sent to a facility other than Miller County that does accommodate female inmates. Rather, Defendants

12

failed to make any effort to protect Boss from exposure to other inmates in the jail, telling her that the Morgan County jail did not have separate facilities for females and that Boss should just "deal" with it. *Cf. Timm*, 917 F.2d at 1101 (finding no privacy violation where guards viewed inmates of the opposite sex through a cell door because the "view through a cell window of an inmate using the toilet is restricted by the size and position of the window"); *see also Hill*, 311 F.3d at 903-04 (holding that a detainee's Fourth Amendment rights were violated where guards allowed a female pre-trial detainee to remain on a "restrainer board naked and spread eagle" in the presence of male guards without any ability to "minimize the privacy invasion by turning or covering herself," which occurred "for a substantial period of time after the threat to security and safety had passed").

Defendants failed to even provide Boss with *de minimus* protection, such as a simple covering for her window, despite her repeated complaints about the conditions of her jail cell. Nonetheless, it was possible to cover one of the small cell windows which was done when Boss was caught trying to talk to her son. Boss also attempted to cover the window herself using toilet paper and toothpaste but this was removed by a jailer. Under these facts, the third and fourth factors of *Turner* weigh in favor of finding a violation of Boss's constitutional right to bodily privacy while in the Morgan County jail. Considering the lack of an institutional need to expose Boss to the male inmate population and the ease with which an accommodation could have been made, the Court concludes that Boss has submitted sufficient facts to support a finding that her constitutional rights were violated.

13

Having concluded that the facts as alleged on summary judgment could support a finding of a constitutional violation, the Court must analyze the second inquiry under qualified immunity: whether the right was clearly established. "A right is clearly established only if the contours of the right are so defined at the time of the incident that a reasonable officer in the defendant's position would have understood that what he was doing violated the law." *Richmond v. City of Brooklyn*, 490 F.3d 1002, 1007 (8th Cir. 2007).

It is well settled that prison officials are given "wide-ranging deference" in the adoption and execution of policies and practices that, in their judgment, are necessary to preserve safety, order, and discipline in their facilities. *Spence v. Farrier*, 807 F.2d 753, 755 (8th Cir. 1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). The Supreme Court has also cautioned not to take too broad a view of what constitutes clearly established law.

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent."

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Thus, a precedential case need not be on all fours to clearly establish a constitutional violation, but it must be sufficiently analogous to put a reasonable officer on notice that his conduct was unconstitutional." *Hill*, 311 F.3d at 904.

As far back as at least 1990, the Eighth Circuit has recognized that inmates have a limited right to bodily privacy, holding that limited observation by opposite-sex guards does

14

not violate inmates' right to privacy. *See Timm*, 917 F.2d at 1102. In addition, Missouri law and Morgan County's written policies have defined the contours of acceptable treatment with regard to male and female inmates. Missouri law requires that "[p]ersons confined in jails shall be separated and confined according to sex." Mo. Rev. Stat. § 221.050. Morgan County's written policy is to keep females housed "separately and out of normal sight and sound of the general male population." Morgan County Sheriff's Department, *Adult Detention Operational Procedures*, § 2.3(D)(2) [Doc. # 35, Ex. I].

The jailers did not send Boss to a separate facility or cover up the windows in her various jail cells so that she would not be exposed to other male inmates while using the toilet. Rather, when Boss complained about the toilet, she was told by one of the jailers that Morgan County did not "house females and that is why the toilets are like that and to just deal with it." [Doc. # 35, Ex. A, ¶ 37].

It is true that the Eighth Circuit in *Hill v. McKinley* held that the officers who violated a pretrial detainee's constitutional privacy rights by allowing her to be exposed to male guards for a significant period of time were entitled to qualified immunity given the "holdings in several other cases that prisoners have no general right not to be seen by guards of the opposite sex." 311 F.3d at 905. However, that was a case that involved guards viewing an inmate of the opposite sex. This case involves the circumstance of inmates and other jail staff of the opposite sex with no readily apparent need to see Boss using the toilet. Boss had a clearly established right not to be seen in such a position by other inmates, absent some

15

institutional justification.  *See, e.g.*, *Timm*, 917 F.2d at 1100 (8th Cir. 1990) (an inmate retains some privacy rights when entering a prison that must be balanced against legitimate institutional needs).  Yet, Defendants have given no facially logical reason or explanation for their exposure of Boss to other inmates.  There is no evidence that she could not be taken to another facility that would comply with Missouri law and Morgan County policy.  There was no emergency and accommodations could easily have been made.  Even providing a blanket may have been enough.  When there was a need by the jailers to cover one of the windows to prevent contact between Boss and the rest of the population because she was talking to her son, a cover for a window was readily located and used.

In sum, the jailers in their individual capacities are entitled to qualified immunity on the claims in Count II related to the issue of Boss's sleeping conditions at the jail but are not entitled to qualified immunity on her privacy claim.

### D.    Morgan County Liability

A local government cannot be held liable for its employees' unconstitutional acts under a *respondeat superior* theory.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  A local government may be held liable only if the plaintiff identifies a particular policy, custom, or practice that resulted in the alleged constitutional violations.  *Id.* Thus, a local government may be held liable on the theory that an action taken by the local government violates federal law or directs an employee to do so.  *Id.*  A local government may also be held liable on the theory that a facially lawful government action has led an employee

16

to violate a plaintiff's rights where such action "was taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (citing *Canton v. Harris*, 489 U.S. 378, 388-89 (1989)). Where a plaintiff asserts that the local government has not directly inflicted the injury but has caused an employee to do so "rigorous standards of culpability and causation must be applied to ensure that the [local government] is not held liable solely for the actions of its employee." *Id.* at 405.

Finally, a local government may be held liable for failure to properly train its employees, regardless of whether that failure was a result of official policy or unofficial custom, if the county was on notice of its inadequate training. *See Larkin v. St. Louis Hous. Auth. Dev. Corp.*, 355 F.3d 1114, 1117 (8th Cir. 2004).

Because a suit against a county officer in his or her official capacity seeks to recover from the county itself, the same *Monell* analysis applies. *See Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). Therefore, the individual defendants are also each entitled to summary judgment to the extent they are sued in their official capacities if Morgan County is not liable. For the reasons stated below, the Court grants Defendants' motion for summary judgment on the issue of Morgan County's liability.

**1.    Medical Treatment**

With respect to Count I, Boss acknowledges that the Morgan County jail had numerous policies in place to protect an inmate's right to adequate medical care, but argues that these policies were violated in her case, which allegedly resulted in a violation of her constitutional

17

rights [Doc. # 49, pp. 22-25]. "Under the Constitution, however, the range of acceptable medical care is broad." *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009). In addition, an inmate's "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118-19 (8th Cir. 2007) (quoting Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir.1992)).

Boss fails to come forward with any evidence pointing to any Morgan County "policy" or "custom" that violated her right to adequate medical care. *See, e.g.*, *Drake ex rel. v. Koss*, 393 F. Supp. 2d 756, 764 (D. Minn. 2005) ("Although Plaintiffs use the term 'policy' in their opposition memorandum and there is reference made to the County's suicide prevention policy, there is nothing in the record to support a finding that the County had any official policy that arguably played a role in [Plaintiff's] attempted suicide."). Indeed, Boss argues that if Morgan County's written policies were followed, she would have suffered no violation. These written policies provide, for example, that "each inmate is provided medical care from the time of admission throughout the period of incarceration and until release. This continuous care requires timely medical screening for new admissions, physical examinations for sentenced inmates and emergency care for all inmates." Morgan County Classification Policy 9.1. The policies articulated by Boss are facially lawful and Boss does not demonstrate that any policy, written or otherwise, caused a deprivation of her right to medical care.

Boss also does not point to any widespread, permanent, or well settled practice of

violating the Morgan County policies regarding inmate medical care. Rather, in this case, when Boss was transported back to the Morgan County jail, she was seen by a nurse within two and a half hours of her return. Because Boss cannot demonstrate a "policy" or "custom" that violated her right to adequate medical care, Morgan County and all defendants charged in their official capacities are entitled to summary judgment as a matter of law on Count I.

## 2. Privacy and Disparate Treatment

The Court previously concluded that individual jailers were not entitled to qualified immunity based on Boss's privacy claim. Nonetheless, Morgan County is not liable because Boss has failed to meet *Monell* or *Brown* standards.

In this case, Morgan County has a facially lawful policy of keeping male and female inmates out of sight and sound of each other. Nonetheless, it does not maintain a jail with separate facilities for females. In order to demonstrate that Morgan County is liable because of these policies, Boss must demonstrate that Morgan County was deliberately indifferent to the known or obvious consequences of these policies to its female inmates. *See, e.g.*, *Moyle v. Anderson*, 571 F.3d 814, 818 (8th Cir. 2009) ("Because the county's [written] policy was facially lawful and did not compel unconstitutional action, appellants have the high burden of proving that the county's decision to maintain the policy was made with deliberate indifference to its known or obvious consequences.").

Boss cannot demonstrate that a known or obvious consequence of maintaining a jail without separate facilities for women would expose female inmates to the general male inmate

19

population. Boss fails to allege facts demonstrating that such an incident occurred on any prior occasion, nor has she shown that the obvious consequence of maintaining a single gendered jail would lead to women being housed there when the county's policy is to keep women separate and in the past had resulted in women being taken to other facilities. Neither is Morgan County's policy so inadequate that it should have known a constitutional violation was inevitable. *See, e.g.*, *id.* at 819 ("Appellants have not offered any evidence that the county had notice of an alleged inadequacy in the booking policy or that the policy's alleged inadequacy was so patently obvious that the county should have known that a constitutional violation was inevitable."). As a result, the Court grants summary judgment in favor of Morgan County and all defendants charged in their official capacities.

### 3. Training and Supervision of Employees

A county and its officials can be held liable for any constitutional violation resulting from a failure to adequately train employees if that failure rises to the level of "deliberate indifference." *Larkin*, 355 F.3d at 1117. "[To] survive a motion for summary judgment, [a plaintiff] must provide evidence that the [defendant] was on notice that its training procedures 'were inadequate and likely to result in violation of constitutional rights.'" *Id.* (quotation omitted). Notice is proven in two ways: (1) by showing that the failure to train "is so likely to result in a violation of constitutional rights that the need for training is patently obvious," *Thelma D. ex rel. Delores A. v. Bd. of Educ.*, 934 F.2d 929, 934 (8th Cir. 1991), or (2) by showing that "a pattern of misconduct indicates that the [defendant's] responses to a regularly

20

recurring situation are insufficient to protect the [plaintiff's] constitutional rights." *P.H. v. Sch. Dist. of Kansas City*, 265 F.3d 653, 660 (8th Cir.2001).

Boss has not demonstrated that Defendants were on notice that their training procedures were somehow inadequate or likely to result in a violation of Boss's constitutional rights. Boss fails to assert any evidence of a specific training method she complains was inadequate. In fact, Boss does not provide any evidence of the existence, or nonexistence, of training materials. Without referencing the training received or not received, Boss cannot satisfy her burden of proof on failure to train. Moreover, Boss does not demonstrate that there is a pattern of misconduct in the Morgan County jail. Therefore, Morgan County and Defendant Petty are entitled to summary judgment on Count III.

### III.   Conclusion

Accordingly, it is hereby

ORDERED that Plaintiff's Motion to Strike [Doc. # 50] is GRANTED in part and DENIED in part. It is further

ORDERED that Defendants' Motion for Summary Judgment [Doc. # 27] is GRANTED with respect to Counts I and III. It is further

ORDERED that, with respect to Count II, Defendants' Motion is GRANTED as to the individual defendants in their individual and official capacities only with regard to the issue of Boss's confinement related to her sleeping conditions, and as to Defendant Morgan County,

21

Missouri, with regard to Boss's sleeping conditions and her privacy claim and DENIED as to the individual defendants in their individual capacities related to Boss's privacy claim as set forth herein.


                                              s/ Nanette K. Laughrey
_____    NANETTE K. LAUGHREY
                                          United States District Judge
Dated:  October 20, 2009
Jefferson City, Missouri